Harold L. STINSON, and Bridge, Structural and Ornamental Iron Workers Local Union No. 22, AFL–CIO, Plaintiffs–Appellants,

v.

IRONWORKERS DISTRICT COUNCIL OF SOUTHERN OHIO AND VICINITY BENEFIT TRUST, Defendant–Appellee.

No. 88–1287.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 1, 1988.
Decided Feb. 21, 1989.

Frederick W. Dennerline, III, Fillenwarth, Dennerline, Groth & Baird, Indianapolis, Ind., for plaintiffs-appellants.

Lee J. Hutton, Duvin Cahn & Barnard, Cleveland, Ohio, for defendant-appellee.

Before COFFEY, FLAUM and MANION, Circuit Judges.

MANION, Circuit Judge.

Harold L. Stinson ("Stinson") and the Bridge, Structural and Ornamental Iron Workers Local Union No. 22, AFL–CIO ("Local 22") (plaintiffs-appellants are collectively referred to as "Local 22") brought suit against defendant Iron Workers District Council of Southern Ohio and Vicinity Benefit Trust ("Ohio Trust" or "Trust"). Count I of the two-count complaint sought injunctive relief against Ohio Trust's denial of benefits to members of Local 22 following their withdrawal from the Trust. Count II alleged that an amendment to the Trust Agreement violated § 302(c)(5) of the Labor Management Relations Act, 29 U.S. C. § 186(c)(5), in that it prohibited unions withdrawing from the Trust from obtaining a proportional allocation of the Trust reserves owing to their employers' contributions. The district court denied Local 22's request for injunctive relief. Ohio Trust moved for summary judgment on Count I while both parties filed cross-motions for summary judgment on Count II. The district court granted summary judgment in favor of Ohio Trust on both counts. Local 22 appeals only as to Count II. We affirm.

I.

The facts in this case are undisputed and relatively straightforward. Stinson was a participant in Ohio Trust until September 1, 1986. He was formerly a member of the Board of Trustees of Ohio Trust at various intervals between July 1984 until the time of his resignation in May 1986. Local 22 is a labor organization representing employees in the ironworkers trade in Indianapolis, Indiana, and surrounding counties. Ohio Trust is an employee benefit plan within the meaning of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*

Insurance benefits provided by Ohio Trust are funded through contributions submitted by employers having collective bargaining agreements with participating unions. Employer contributions are based on the number of hours worked by each employee. Benefits are available in accordance with a benefit plan which the trustees have adopted. At all times relevant to this lawsuit, all of the local unions participating in the Trust as well as each employer association within the jurisdiction of a participating local union, have had a representative on Ohio Trust's Board of Trustees.

Ohio Trust operates with pooled resources. Employer contributions are pooled without segregation as to each company or local union. A pooled trust accommodates the realities of the ironworkers trade, where employment is dictated by the level of construction in particular locations at particular times. By pooling resources into a common fund, participating unions and employers can better withstand the peaks and valleys which are characteristic

of employment in the construction industry. Pooling contributions is especially suitable in the construction trade, where employees are likely to work for several different employers in several different locations during a short time.

In the early 1980's, Ohio Trust suffered from the combined effects of recessionary unemployment and increased health care costs. During 1982 and 1983, employer contributions—income to the Trust—sharply declined while benefit claims simultaneously rose. As a result, Ohio Trust was forced to dip into its reserves at an alarming rate; at one point the reserves dropped from a level of $7.5 million in early 1982 to a low of approximately $300,000 in early 1984.

The trustees considered a variety of measures in response to the financial crisis facing Ohio Trust. Among these were benefit reductions and increases in employer contribution rates. Ultimately, the trustees settled on tightening employee eligibility rules and increasing the level of employer contributions. In the meantime, Ohio Trust learned that Iron Workers Local 70, a participating local union based in Louisville, Kentucky, planned to withdraw from the Trust. In response to the news of Local 70's anticipated withdrawal, Ohio Trust's actuarial consultant suggested to the trustees that the Trust Agreement be amended. At the time the amendment was proposed, Ohio Trust's consultant believed Ohio Trust's financial situation was so grave that the cost of providing continued eligibility to members of departing Local 70 threatened to bankrupt the Trust. The proposed amendment ("withdrawal amendment"), which was adopted unanimously by the trustees, provided that any participating union could withdraw from the Trust simply by providing three months' advance notice. However, effective upon the date of the union's withdrawal, all persons represented by the withdrawing local union would cease to be eligible for further benefits and no payments would be made from the Trust for the benefit of those persons or to any other trust fund established to provide benefits to the employees represented by the withdrawing union.

A participating union's withdrawal from a trust fund has several detrimental effects. First, since the withdrawing local is typically experiencing a higher level of employment than those remaining in the fund (as was apparently the case with Local 70), there is a decline in income. At the same time, and as a result of the higher level of employment, there is a disproportionately greater number of persons participating through a withdrawing local union who have qualified for continued eligibility. Thus, a departing union, such as Local 22, leaves behind a disproportionate number of people eligible for trust benefits, such as retirees and disabled employees, who will no longer have an employer making contributions on their behalf. Second, the per-person administrative costs of the trust fund increase when a local withdraws. Third, the withdrawal lowers the ratio of active employees to retirees and disabled employees (who retain eligibility). When a local union withdraws, it leaves the fund with fewer remaining active employees to bear the burden of expensive retiree and disabled employee health claims. In the case of Local 22, the ratio of active employees to retirees dropped from 3:1 to 2.5:1. Fourth, there is a tendency among individuals about to lose health insurance coverage to make greater use of their insurance before going to another plan. Here, Local 22 all but guaranteed this result by advising its membership to submit claims to Ohio Trust before its withdrawal.

Ohio Trust's Executive Committee first considered the withdrawal amendment in February 1984. The Executive Committee is a body of three union trustees and three employer trustees which meets monthly and makes recommendations to the full Board of Trustees or takes action on business occurring between the quarterly meetings of the full Board, subject to the full Board's ratification. At this time, the Executive Committee included Local 22 representative Vestal Stinson (a retired member of Local 22 and plaintiff-appellant Harold Stinson's father). The Executive Committee considered the amendment three times before finally recommending that it be

adopted. Vestal Stinson voted for the amendment. The Board unanimously voted to adopt the amendment at its regular meeting in April 1984.

The withdrawal amendment reads in relevant part:

> *Section 5.* Any Union participating herein may withdraw from this Trust Agreement and the Trust herein created, provided that such Union serves written notice of a change in its Collective Bargaining Agreement eliminating the requirement for contributions upon each of the trustees of said Trust at least three months prior to the effective date of the withdrawal.... Notwithstanding such withdrawal, no payments whatsoever shall be made from or out of the Trust Fund to or for the benefit of the employees represented by such withdrawing Union or to any other trust fund or other entity created for the purpose of providing health and welfare benefits to the employees represented by such withdrawing Union and, by such withdrawal, the withdrawing Union and the Employees and their Beneficiaries, represented by it, or any person claiming by or through or under any of them, shall have no further right, title or interest in or to the Trust Fund or any part thereof....

After the amendment passed, Ohio Trust notified all local unions and all participating employees of the provision. A copy of the amendment together with an accurate summary of its meaning was mailed to each participant in the summer of 1984. Later that year, when the trustees distributed copies of the plan's new eligibility rules to all local unions and participants, this information was repeated.

Two years after the adoption and publication of the withdrawal amendment, Local 22 withdrew from Ohio Trust. During this two-year interim, Ohio Trust's financial health increased substantially. By May 31, 1986, roughly when Local 22 gave notice of its intent to withdraw, Ohio Trust's reserves had soared to $7.5 million. Just before Local 22's withdrawal, Ohio Trust embarked on a program of self-insurance for its participants' medical benefits. Adequate reserves are a critical factor in the success of self-insurance for a health and welfare fund. Based upon their consultant's financial projections, the trustees voted at an April 1986 meeting to convert to self-insured status. Vestal Stinson had reservations about this course of action and shortly after the meeting, he convened a meeting of the Local 22 membership where the members voted unanimously to pull out of Ohio Trust and establish a local fund of their own.

Local 22 gave notice of its withdrawal in May 1986 to be effective on September 1, 1986. Ohio Trust responded by assuring that all claims incurred before September 1, 1986 would be paid in accordance with the benefit plan. Ohio Trust also notified Local 22 that it would not offer extended eligibility to withdrawing participants beyond September 1, according to the Trust Agreement.

Before the effective date of Local 22's withdrawal, it established its own benefit plan, and effective September 1, 1986, all participating employers within Local 22's jurisdiction began paying their contributions into the Local 22 Trust Fund. The benefits provided under this new plan were identical to those offered by Ohio Trust. All participants received exactly the same insurance coverage they would have received had Local 22 not withdrawn from Ohio Trust. The only Local 22 participants who continue to participate in Ohio Trust are retirees and persons on disability. They remain eligible to continue with Ohio Trust by paying a portion of the cost of their plan. The amount they pay is lower than the actuarial cost of their benefits; the difference (subsidy) is paid from Ohio Trust's reserves.

The district court held that in view of the fact that Local 22's representative on the Executive Committee and the Board of Trustees (Vestal Stinson) had voted in favor of the withdrawal amendment, Local 22 was estopped from contending this action was arbitrary, capricious, or otherwise a structural defect in violation of § 302(c)(5). The district court also held that Local 22 had waived any right it may have had to

protest the applicability of the amendment to its subsequent withdrawal because the unequivocal conduct and statements of its representative evidenced a knowing and open willingness to subject itself to the terms of the amendment. Further, the court reasoned that all of Local 22's members had actual notice of the amendment's terms but nonetheless unanimously and voluntarily elected to withdraw from Ohio Trust; thus, the court held that Local 22 had waived its rights to both continued eligibility and to a proportional share of Ohio Trust's reserves. The district court also addressed the merits, observing that § 302(c)(5) "does not require that an employee, employer, group of employers, or union be given a proportionate share of a trust fund's assets simply because a decision is reached to cease participation in the trust." Reviewing the withdrawal amendment under the arbitrary and capricious standard, *International Association of Bridge, Structural and Ornamental Iron Workers, Local 111 v. Douglas*, 646 F.2d 1211 (7th Cir.1981), *cert. denied*, 454 U.S. 866, 102 S.Ct. 328, 70 L.Ed.2d 166 (1981), the trial court concluded that Ohio Trust did not act arbitrarily or capriciously.

## II.

Section 302, 29 U.S.C. § 186, prohibits an employer from paying anything of value to a union or other employee representative except in certain situations specified in the statute. Section 302(c)(5) permits employer contributions to a trust fund established by the employee representative if, among other things,[1] it is established "for the sole and exclusive benefit of the employees of such employer, and their families and de-

pendents (or of such employees, families, and dependents jointly with the employees of other employers making similar payments, and their families and dependents)...." 29 U.S.C. § 186(c)(5). This section specifically authorizes pooled trust funds like Ohio Trust's. *Local Union No. 5, Sheet Metal Workers' Int'l Ass'n v. Mahoning and Trumbull County Building Trades Welfare Fund*, 541 F.2d 636, 639 (6th Cir.1976). A pooled trust fund "is simply one large fund contributed to by a number of employers, instead of many smaller funds each contributed to by only one employer." *Raymond v. Hoffman*, 284 F.Supp. 596, 601 (E.D.Pa.1966). The "sole purpose" of § 302(c)(5) is to ensure that employee benefit trust funds are legitimate trust funds, used actually for the specified benefits to the employees of the employers who contribute to them. *United Mine Workers of America Health & Retirement Funds v. Robinson*, 455 U.S. 562, 570, 102 S.Ct. 1226, 1231, 71 L.Ed.2d 419 (1982) (citations omitted). Under § 302(e), federal courts have jurisdiction to "restrain violations" of § 302 and to consider "structural deficiencies." *Miranda v. Audia*, 681 F.2d 1124, 1125 (9th Cir.1982); *Insley v. Joyce*, 330 F.Supp. at 1231.

### A. Standard of Review

Local 22 alleges that the Trust Agreement, as amended by the withdrawal amendment, contains a "structural defect" in violation of § 302(c)(5).[2] It asserts that the Trust does not operate for the "sole and exclusive benefit" of Local 22's withdrawing employees for whom contributions were made because those contributions will

---

1. Section 302(c)(5) provides a statutorily enumerated list of requirements, including the following:

    (1) the trust fund must be established for the sole and exclusive benefit of employees and dependents;

    (2) payments must be held in trust to pay, from principal or income, for such employees' medical care, pensions, illness, etc.;

    (3) the detailed basis of payments must be set forth in writing;

    (4) employers and employees must have equal representation, with a provision for a neutral person or umpire;

    (5) the plan must contain provisions for an annual audit; and

    (6) there must be separate trusts for pension and annuity funds.

*Insley v. Joyce*, 330 F.Supp. 1228, 1231 (N.D.Ill. 1971).

2. The term "structural defect," as used here, concerns violations of the statutorily enumerated list of requirements contained in § 302(c)(5). *Insley v. Joyce*, 330 F.Supp. at 1231.

be used for other employees in the Trust after Local 22 has withdrawn. As relief, Local 22 asks that we strike the offending provision.[3] The parties propose differing standards by which to measure the challenged amendment. Local 22 argues that we should only evaluate whether the Trust, as amended, violates substantive law (§ 302(c)(5)), without regard to the trustees' motivations or whether it was reasonable to adopt the amendment. *Cf. UMWA v. Robinson*, 455 U.S. 562, 102 S.Ct. 1226, 71 L.Ed.2d 419 (Court held that where trust agreement grows out of a collective bargaining agreement, there is no reasonableness inquiry and that courts should limit their review to ascertaining whether the trust agreement violates substantive federal law). Indeed, Local 22 doesn't challenge the wisdom of the withdrawal amendment insofar as it was intended to ensure the Trust's financial stability. While Local 22 recognizes that benefit eligibility claims are typically evaluated under the arbitrary and capricious standard, it contends that the present dispute stands on a different footing from a denial of benefits claim, thus warranting a different standard of review. In other words, Local 22 agrees that decisions over how to split the trust fund pie between beneficiaries are vested in the trustees' wide discretion. By contrast, it argues, questions concerning the structure of the fund itself are not discretionary, but are controlled by the requirements set forth in § 302(c)(5).

Ohio Trust on the other hand, sees no difference between a claim for benefits and a claim for a proportional share of the trust reserves (which the Trust's structure—the withdrawal amendment—prevents). It contends our review is limited to considering only whether the trustees acted arbitrarily or capriciously. *Int'l Ass'n of Bridge, Structural and Ornamental Iron Workers Local 111 v. Douglas*, 646 F.2d 1211.

Under § 302(c)(5), jurisdiction extends to deciding whether a benefit plan is "arbitrary, capricious, or in some way contrary to the sole and exclusive benefit of [the] employees." *Johnson v. Botica*, 537 F.2d at 933. *See also Reiherzer v. Shannon*, 581 F.2d 1266, 1270 (7th Cir.1978). This permits us to determine more than just whether the trustees acted arbitrarily or capriciously; we may also decide if the Trust contains "structural" deficiencies in violation of § 302(c)(5) apart from whether the trustees acted reasonably or not. Courts have occasionally collapsed this into one inquiry, reasoning, for example, that arbitrary and capricious eligibility standards are themselves structural defects because such rules affect the entire operation of the Trust. *See, e.g., Johnson v. Botica*, 537 F.2d at 933–34. Here, however, we think it better to make separate inquiries. In any event, as it is now interpreted, the arbitrary and capricious standard allows judicial review of questions or errors of law. *See Van Boxel v. Journal Company Employees' Pension Trust*, 836 F.2d 1048, 1050 (7th Cir.1987) (and cases cited therein);[4] *Miranda v. Audia*, 681 F.2d at 1125; *Insley v. Joyce*, 330 F.Supp. at 1233, 1234. Such a standard of review is necessary under the facts of this case, where it is alleged that the Trust, as established, contravenes the statutory requirements contained in § 302(c)(5). It is not enough simply to conclude, as we must, that the trustees acted neither arbitrarily nor capriciously in adopting the withdrawal amendment. Surely it would be curious to suggest that an unlawful act or structural defect is placed beyond our reach just because it was the result of a reasonable course of action. If, for example, a trust fund failed to set forth in writing the basis of its payments or to contain provisions for an annual audit, it would plainly violate § 302(c)(5) even if there were entirely rea-

---

**3.** In *Johnson v. Botica*, 537 F.2d 930 (7th Cir. 1976), we held that the proper remedy under § 302(e) would not be to reform or strike a deficient trust provision, but rather to require the trustees to formulate a substitute provision which would meet the statutory standards. *Id.* at 937–38. We do not reach that issue here because we find the withdrawal amendment lawful under § 302(c)(5).

**4.** In *Van Boxel*, we observed that the arbitrary and capricious standard employed under ERISA was borrowed from § 302(c)(5). 836 F.2d at 1052.

sonable grounds for doing so. *Cf. Local Union No. 5 v. Mahoning and Trumbull Building Trades Welfare Fund,* 541 F.2d at 639 (speculating that an eligibility standard could violate the "sole and exclusive benefit" requirement without being arbitrary and capricious). *See also Nelson v. Joyce,* 404 F.Supp. 489, 491 (N.D.Ill.1975) (eligibility decisions and decisions involving trustees' discretion reviewed under arbitrary and capricious standard, while questions of law reviewed more carefully, as questions of law are uniquely within the court's expertise). We decide, then, whether the Trust, as amended, is arbitrary, capricious,[5] or in some way contrary to the sole and exclusive benefit of the employees, thus making it structurally defective.

### B. Application of Standard

There can be no doubt that by adopting the withdrawal amendment, the trustees acted in the best interest of the Trust's beneficiaries by ensuring Ohio Trust's financial stability. Several factors precipitated the amendment. For example, from early 1982 to 1984, the Trust's reserves dropped sharply, falling from nearly $7.5 million to $300,000. Further, Local 70's recent departure threatened to bankrupt the Trust. Obviously, the trustees "were endeavoring to ensure the viability" of Ohio Trust and acting for "the sole benefit of the employees covered by the Trust." *Int'l Ass'n of Bridge, Structural and Ornamental Iron Workers Local 111 v. Douglas,* 646 F.2d at 1215. Under these circumstances, we cannot say the trustees acted arbitrarily or capriciously. *Id. Cf.*

*Central States, Southeast and Southwest Areas Pension Fund v. Central Transport, Inc.,* 472 U.S. 559, 105 S.Ct. 2833, 86 L.Ed.2d 447 (1985) (concern for assuring financial integrity of benefits plan was "proper and weighty" under ERISA).

■ But in adopting the withdrawal amendment did Ohio Trust violate § 302(c)(5)'s requirement that trust funds be established for "the sole and exclusive benefit" of the employees? In other words, was the amendment unlawful even though reasonable? *Local No. 5 v. Mahoning and Trumbull, supra.* Local 22 argues that because its active employees are no longer covered by the Trust, the money contributed for those employees which is being withheld pursuant to the withdrawal amendment is being used not for their benefit, but for the benefit of other employees. This, it argues, runs afoul of § 302(c)(5). We disagree.

Local 22 ignores the fact that its retirees and disabled employees are still covered by the Trust. These individuals are considered "employees" under § 302(c)(5). *Allied Chemical Workers, Local Union No. 1 v. Pittsburgh Plate Glass Co.,* 404 U.S. 157, 169–70, 92 S.Ct. 383, 392–93, 30 L.Ed. 2d 341 (1971); *Reiherzer,* 581 F.2d at 1276; *Blassie v. Kroger Co.,* 345 F.2d 58, 70 (8th Cir.1965) (Blackmun, J.); *Crawford v. Cianciulli,* 357 F.Supp. 357, 369 (E.D.Pa. 1973). The term "employee" in § 302(c)(5) includes "current employees and persons who were covered current employees but [who] are now retired." *Blassie,* 345 F.2d at 70. "[A] person who fulfills the contract

5. The Supreme Court in *UMWA v. Robinson, supra,* however, stated that § 302 "hardly embodies" a "reasonableness requirement," adding that § 302's "plain meaning is simply that employer contributions to employee benefit trust funds must accrue to the benefit of employees and their families and dependents, to the exclusion of all others." *UMWA v. Robinson,* 455 U.S. at 570, 102 S.Ct. at 1231. At first blush, this appears to rule out our applying the arbitrary and capricious standard at all. But we note that the Court's holding is limited to trust fund eligibility rules established in collective bargaining agreements. *Id.* at 564, 102 S.Ct. at 1228; *Central Tool Co. v. Int'l Ass'n of Machinists National Pension Fund,* 811 F.2d 651, 659–64 (D.C.Cir. 1987); *Niagara of Wisconsin Paper Corp. v. Pa-*

*per Industry Union–Management Pension Fund,* 800 F.2d 742, 745 n. 7 (8th Cir.1986); *Brown v. Retirement Committee of Briggs & Stratton Retirement Plan,* 797 F.2d 521, 530 (7th Cir.1986), *cert. denied,* 479 U.S. 1094, 107 S.Ct. 1311, 94 L.Ed.2d 165 (1987). Thus, even though the Court spoke of the absence of *any* statutory requirement of reasonableness in § 302, apparently it was content to permit courts to use the arbitrary and capricious standard in those cases where the challenged rule was not the product of a collective bargaining agreement. *See Central Tool Co.,* 811 F.2d at 657–58; Comment, *The Arbitrary and Capricious Standard Under ERISA: Its Origins and Application,* 23 Duq.L. Rev., 1033, 1037–38 (1985).

requirements for the payment of benefits can lawfully be the beneficiary of a § 302(c)(5) trust so long as he was, during any period of time otherwise covered by the trust agreement, an employee of a currently contributing employer." *Crawford*, 357 F.Supp. at 369. Thus, even under Local 22's narrow interpretation of § 302(c)(5) which would require that a contributing employer's contributions be used only for its own employees, employees of Local 22's employers—Local 22's retirees and disabled employees—remain in the Trust; thus it continues to operate for their "sole and exclusive benefit" and is lawful under § 302(c)(5).

The Second Circuit's decision in *Local 50, Bakery Workers Union v. Local 3, Bakery Workers Union*, 733 F.2d 229 (2d Cir.1984) does not compel a different result. There, Local 50 represented Entenmann's, Inc.'s employees and established a pooled multiemployer welfare fund covering those employees. Employer contributions, including those made by Entenmann's, Inc., were made into the Local 50 fund. Entenmann's, Inc.'s employees voted to switch bargaining representatives to Local 3 and Entenmann's, Inc.'s contributions thereafter were to be made to the Local 3 welfare fund. Both the Local 3 welfare fund and Entenmann's, Inc. sought to compel the Local 50 fund to pay over a proportional share of its reserves owing to Entenmann's, Inc.'s contributions. The district court ordered Local 50 to pay Local 3 a proportional share, and the Second Circuit agreed, holding that the absence of a provision in the Local 50 fund requiring a transfer of funds in such circumstances constituted a structural defect under § 302(c)(5).

In *O'Hare v. General Marine Transport Corp.*, 740 F.2d 160 (2d Cir.1984), *cert. denied*, 469 U.S. 1212, 105 S.Ct. 1181, 84 L.Ed.2d 329 (1985), the Second Circuit rejected a similar proportional share claim

made by withdrawing fund participants, distinguishing *Local 50* on several grounds.[6] *O'Hare*, 740 F.2d at 173. *See also Trapani v. Consolidated Edison Employees' Mutual Aid Society, Inc.*, 651 F.Supp. 400 (S.D.N.Y.1987). In *Local 50*, the court observed that all of the employers' employees withdrew from the former fund, leaving no employees behind to benefit from the employers' contributions. By contrast, in *O'Hare*, some employees remained fund participants, leading the court to state:

> [t]o claim that monies retained by the Funds contributed by an employer on behalf of all its employees is not contributed "for the sole and exclusive benefit of the employees of such employer" whenever *some* of the employees choose to leave the union and fund would be an unfair and unrealistic construction of section 302(c)(5).

740 F.2d at 173 (emphasis added).

Here, as in *O'Hare*, some Local 22 employees remain participants in Ohio Trust—the retirees and disabled employees. *Blassie, supra; Crawford, supra.* Thus, Local 22's argument that Ohio Trust is not operating or established for the "sole and exclusive benefit" of Local 22's members simply because its active members have withdrawn when other employees remain, is "an unfair and unrealistic construction of section 302(c)(5)." *O'Hare*, 740 F.2d at 173.

But even if our decision did not rest on the fact that some Local 22 employees remain covered by the Trust, we would reject Local 22's overly narrow reading of § 302(c)(5), at least in this case. Ohio Trust is a pooled trust which is particularly suited to cover employees in the construction industry where there are predictable surges and declines in employment. The pooled trust spreads the risk of low employment activity within a particular loca-

---

**6.** Another distinction not relied on by the *O'Hare* court is relevant here, namely, the employees' freedom to choose a collective bargaining representative. The court in *Local 50* was influenced by the fact that, if it decided in favor of Local 50 (the former welfare plan), it would be providing the departing employees a "great disincentive" to ever changing bargaining representatives and would be impinging on the employees' free choice of collective bargaining representative, thus allowing unions to become less attentive to their employees. *Id.* at 233. These concerns are not at issue in this case.

tion which would otherwise be insufficient to support the continued eligibility of its members, the costs of retiree coverage, or the plan's administrative costs. Moreover, pooling is especially suitable in the construction industry where employees are likely to work for several different employers in several different locations over a short period.

■ Almost by definition there will be imprecision regarding pooled funds. *Local No. 5 v. Mahoning and Trumbull,* 541 F.2d at 639. Nothing in § 302(c)(5) requires "that an employer's contribution be set aside only for his employees when the employer payments are made to a multi-employer trust fund. The advantages of a 'pooled trust' fund do not accrue to any particular employer, but rather are beneficial to all the employers contributing." *Crawford,* 357 F.Supp. at 373. Likewise, as the Sixth Circuit explained, "[t]hat the amended rule results in certain employers' contributions being used for other than their employees does not violate the 'sole and exclusive benefit' requirement." *Local No. 5 v. Mahoning & Trumbull,* 541 F.2d at 639. *See also Central Tool Co.,* 811 F.2d at 664 n. 77 (because § 302(c)(5) does not place restrictions on the allocation of the funds among persons protected by § 302(c)(5), eligibility rules are valid under § 302(c)(5) "so long as they result in distribution of benefits only to employees on whose behalf contributions to the fund have been made"); *Turner v. Local Union No. 302 International Brotherhood of Teamsters,* 604 F.2d 1219, 1228 (9th Cir. 1979); *Huge v. Maximeadows Mining Co.,* 459 F.Supp. 267, 269 (N.D.Ala.1978). Thus, even if no Local 22 employees remained in the fund—setting aside for the moment that its retirees and disabled employees

remain covered by the Trust—the contributions from Local 22's employers are being used only for employees on whose behalf contributions to the fund were made—albeit not current employees of Local 22's employers. This does not violate the "sole and exclusive benefit" requirement.[7]

## III.

In sum, Ohio Trust did not act arbitrarily or capriciously in adopting the withdrawal amendment.[8] Local 22 wrongly argues that it has no employees remaining in the Trust. Its retirees and disabled employees are considered employees under § 302(c)(5), *Blassie, supra; Crawford, supra,* and remain fund participants. Thus, even under Local 22's rigid—and incorrect—reading of § 302(c)(5), the Trust is operating for the "sole and exclusive benefit" of Local 22's employers' employees. Moreover, that the withdrawal amendment possibly results in Local 22's employers' contributions being used for other than their own employees, does not violate § 302(c)(5)'s "sole and exclusive benefit" requirement in this case. *Local No. 5 v. Mahoning and Trumbull, supra.* For the foregoing reasons, the district court's decision is AFFIRMED.

■

---

7. In support of its structural defect claim, Local 22 also relies on *Alvares v. Erickson,* 514 F.2d 156 (9th Cir.1975), *cert. denied,* 423 U.S. 874, 96 S.Ct. 143, 46 L.Ed.2d 106 (1975), and *Molnar v. Wibbelt,* 789 F.2d 244 (3d Cir.1986). We find both cases inapposite. In *Alvares,* the Ninth Circuit's decision was limited to whether there was jurisdiction under § 302(e) to raise a structural defect claim. Jurisdiction is not an issue here. In *Molnar,* the alleged structural defects did not concern the "sole and exclusive benefit" requirement under § 302(c)(5), but rather concerned two distinct requirements, namely, whether the trust was receiving payments from an employer specified in a written agreement, and whether the trust was being administered jointly by representatives of management and labor. Neither of these structural requirements are at issue here.

8. Because we affirm the district court's decision on the merits, we do not reach the issues of waiver and estoppel.